FREDERICK W. STEPHENS *v.* LEWIS C. DIXON

[No. 225, September Term, 1975.]

*Decided January 28, 1976.*

The cause was argued before MORTON, GILBERT and MOORE, JJ.

*Herbert D. Morrison,* with whom was *Ted R. Hudson* on the brief, for appellant.

*Donald J. Gilmore,* with whom were *Charles O. Fisher* and *Walsh, Fisher & Gilmore* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

The appellant brought a two-count civil action against the appellee in the Circuit Court for Carroll County charging assault and battery in Count I and defamation of character in Count II. The trial judge allowed the assault and battery count to go to the jury which returned a verdict in favor of the appellee. He granted a directed verdict in favor of the appellee on the defamation count at the conclusion of the appellant's case.

In this appeal it is contended that the trial judge committed error in his instructions to the jury with respect to the alleged assault and battery and in directing a verdict for the appellee on the defamation count.

The record indicates that appellant, Frederick W. Stephens, lived on a farm near Mount Airy, Maryland. For several years he had been employed as an engineer at the National Institute of Health (NIH). The appellee, Lewis C. Dixon, was the Mayor of Mount Airy and also employed by the Naval Service Reference Center.

In October, 1968, Mr. Stephens became aware of the fact that the town of Mount Airy had decided to locate a sewage treatment plant on what was then Mr. Stephens' property. In August, 1969, negotiations began concerning compensation to Mr. Stephens. A private settlement was never reached and the property was finally obtained by the town through condemnation proceedings.

On June 18, 1973, Mr. Stephens attended a town meeting to lend support to a community association on a matter unrelated to the present case. Mr. Stephens testified at the trial below that toward the end of the meeting he attempted to make a statement to the effect that he was waiting to receive answers to letters he had written to the mayor "about deficiencies in the construction [of the treatment plant] on my farm." The meeting apparently adjourned before Mr. Stephens was able to say anything so he decided to follow the mayor into an adjoining room to discuss his grievance with the mayor personally. When Mr. Stephens asked the mayor for a written response to his letters, the mayor, according to Mr. Stephens, indignantly responded that "we're not going to write you anything." At this point the discussion ripened into a rather heated argument. The mayor requested Mr. Stephens to leave. Mr. Stephens refused. A physical encounter ensued and continued until several people entered the room and broke it up.

According to Mr. Stephens, the mayor began the physical altercation. The mayor claimed he acted in self-defense. Eric Green, a staff writer for the *Frederick News Post* who witnessed the episode, could not remember who threw the first punch.

For several months thereafter the local newspapers carried stories of the incident which included statements alleg-

edly made by the mayor concerning the altercation and the culpability of the participants. The controversy culminated in a 2,000 word written statement [1] by the mayor describing his version of the incident which he read into the minutes of a town council meeting in October, 1973, and then made copies available to the press. As a result of the mayor's statement, the town council passed a resolution barring Mr. Stephens from attending meetings "until he publicly apologizes to this Body and the Mayor for his misconduct."

We turn first to appellant's contentions with respect to the trial judge's instructions. He urges that the failure "to instruct the jury that an assault and battery includes an unlawful touching of another by the aggressor" constituted reversible error. Since the omission was not objected to below, and appellant concedes this, the issue was not properly preserved for review by this Court. Maryland Rule 554 e. *See also Podolski v. Sibley,* 12 Md. App. 642 (1971).

Before punitive damages can be awarded for civil assault and battery, malice must be shown. *Vancherie v. Siperly,* 243 Md. 366 (1966). Appellant contends that the trial judge erred "in failing to instruct the jury that malice can be inferred from the act of a public official violently depriving a citizen of his right peaceably to petition the government." He argues that persons who violate the Federal Civil Rights Act, 42 U.S.C. § 1981 *et seq.,* may be held liable for punitive damages. By analogy, he asserts, "The jury should have the right to decide whether the assault and battery were performed with the purpose of depriving the Plaintiff-Appellant of his right to assemble and petition the government * * *."

The short answer to this contention is that no such analogy exists. If appellant believed that his constitutional rights were violated, he should have filed suit alleging violation of 42 U.S.C. § 1983 of the Federal Civil Rights Act. The trial judge had no reason to instruct the jury that they could infer malice from an infringement of appellant's First

---

1. Because of the statement's length, we have attached it as an appendix to this opinion.

Amendment rights when appellant did not even allege in his declaration that such an infringement occurred.

Even if appellant had alleged a malicious infringement of his First Amendment rights, appellant's proper method of recovery would be via 42 U.S.C. § 1983. To say that the mayor maliciously deprived appellant of a constitutional right is quite different from saying that the mayor maliciously committed an assault and battery on appellant. "A wrongful deprivation of appellant's civil rights" may be indicative of malice under 42 U.S.C. § 1983, but certainly it is not evidence of malice on a count charging assault and battery.

The trial judge advised the jury, at considerable length, that before they could assess punitive damages for the alleged assault and battery, they must first find that the appellee acted with malice toward the appellant and the trial judge proceeded to give the jury a comprehensive definition of the word "malice." Under the circumstances, we find appellant's contention with respect to this segment of the instructions to be without merit.

The appellant also contends that the trial judge erroneously failed to instruct the jury that the appellee must prove, by a preponderance of the evidence, that he acted in self-defense.

Although appellant timely objected to the omission of his requested charge, he failed to state "the ground of his objection" as required by Maryland Rule 554 d. Nevertheless, where the ground is evident, the issue will be considered, notwithstanding the failure to comply with the rule. *Kowalewski v. Carter*, 11 Md. App. 182 (1971). In the present case, it is clear that the appellant believed the jury was entitled to know who had to prove self-defense and the quantum of proof necessary to sustain the plea.

The law in Maryland places the burden of proving justification in an assault and battery count upon the defendant. *Sellman v. Wheeler*, 95 Md. 751 (1902). In that case, holding that an instruction on the burden of proof had been properly given at the trial below, the Court stated, at 757:

"The rule has been well stated in *Blake v. Damon,* 103 Mass. 199, thus: 'If plaintiff alleges acts which if proved, and not justified, will sustain his action, and the defendant seeks to justify them, the burden is upon him to prove his justification.' And this rule was well illustrated in *St. John v. Eastern R. W.,* 1st Allen 574, where it was said: 'Where plaintiff was a passenger on a railroad, and defendant by its agents assault him, if the assault is proved, the burden of justifying it rests upon the defendant *as in ordinary cases.*' "

If there is a conflict in the testimony on any material point, it is proper to give an instruction on the burden of proof. *Meyer v. Frenkil,* 116 Md. 411 (1911). Appellee does not dispute the law, but apparently believes that there was no material conflict in the testimony on the issue of self-defense. He argues that "the Trial Court could have properly granted a directed verdict [in his favor], either at the end of the Plaintiff's case, or the entire case." He relies on several statements made by the reporter, Mr. Green, at the trial which tended to show that the mayor acted in self-defense. In particular, on cross-examination, Mr. Green testified that immediately before the scuffle began, "Mr. Stephens was the aggressor." His testimony, however, clearly indicated that no matter who was the aggressor in the verbal dispute, he could not remember "how each one got their arms on the other." Furthermore, appellant testified that Mayor Dixon delivered the first blow. Clearly, there was conflicting testimony on the issue and, accordingly, the trial judge correctly denied appellee's motion for a directed verdict. It is equally clear that a jury instruction on the burden of proving that the appellee acted in self-defense would have been proper and from our reading of the instructions as a whole, the refusal to comply with appellant's request for such an instruction constituted prejudicial error. *Kowalewski v. Carter, supra.* The trial judge properly instructed the jury that "the burden of proof is upon the plaintiff [appellant] to make out his case and to prove to your satisfaction by a preponderance of evidence

that an assault was committed * * *." He refused, however, to advise the jury that the appellee had the burden of proving, by a preponderance of the evidence, that he acted in self-defense. Since there was a material difference in the testimony of the witnesses, identification of the party carrying the burden of proof became especially significant. The jury returned twice to ask the court for a definition of "assault." Although it is not our function to second-guess the jury, the possibility that they were having difficulty determining who was the aggressor indicates the necessity for the instruction. We conclude that the failure to give the requested instruction compels a reversal of the judgment on the assault and battery count.

Appellant finally contends that the trial judge improperly granted the appellee's motion for a directed verdict on the defamation count at the end of appellant's case. In granting the motion, the trial judge stated:

> "But more specifically, I think more important than anything else is that there has been no damages proven and the Court, the jury would have to speculate. No other way could they do it. As a matter of fact, this letter here somewhere, as I recollect it, I may be wrong, but indicates that he's not interested in monetary gain and his change in jobs he's just interested in helping people or something like that. But the jury would have to speculate on his present salary, which they don't know, on any future salary which he might expect, which they don't know, to the extent of his damage to his reputation how long it would last or even if it's in effect today. All of this would be purely speculation and there is no, and I can't find that the words are libelous per se. I think that would be a question for the jury. So that there are no damages that I can find that would be available to the jury to consider unless by pure speculation. And we can't allow that. So I'll grant the motion on the second count."

In reaching this conclusion, the trial judge had before him the testimony of Alfred L. Perkins, head of the division in which Mr. Stephens worked at the National Institute of Health. Mr. Perkins testified that in June, 1973, Mr. Stephens applied for an executive training program at the N.I.H. The application was submitted prior to the altercation between Mr. Stephens and the mayor. Mr. Perkins wrote a "letter of recommendation for Mr. Stephens to indicate that he would be well qualified and suitable for the program." He stated that Mr. Stephens also applied for a position as his assistant.

According to established procedure, a Qualifications Review Board reviews the applications and places each in one of three categories according to its quality. The Board's determination is turned over to a recommending official, who in the present case was Mr. Perkins, to recommend one of the candidates for the position. Another official then makes the final selection. Mr. Stephens' application was rated "highly qualified," which placed him in the most desirable category. Subsequently, newspaper articles containing stories of the fight between the mayor and Mr. Stephens were circulated in Mr. Perkins' office. Mr. Perkins did not recommend Mr. Stephens for the position but stated at the trial his knowledge of the fight was not a factor in his decision. Mr. Stephens was not selected for either the executive training program or the position as assistant to Mr. Perkins.

Jack S. Robbins testified that Mr. Stephens applied for a position in his office at the N.I.H. He stated that Mr. Stephens was rated as "qualified," which is the least desirable of the three alternative categories. Mr. Robbins further stated that newspaper articles containing accounts of the altercation between Mr. Stephens and the mayor were circulated around the office. To his knowledge at least one of the individuals on the Qualifications Review Board knew of the incident. Mr. Robbins indicated that his knowledge of the fight between Mr. Stephens and the mayor was a factor in his own evaluation of Mr. Stephens which was later submitted to the review board. He could not, however,

estimate the effect his knowledge of the fight had on his evaluation.

Mr. Stephens testified that in August, 1973, he was approached by "the contracting officer from the Frederick County Research Center" and subsequently applied for a position there. In his application for the position he denied responsibility for the alleged assault on the mayor. He was not selected to fill the position.

Dr. Mary Rita Miller, a professor of linguistics, testified that as a result of her professional analysis of the written statement read by the mayor to the town council, which was subsequently made available to the press,

"the general impression is that although the Mayor says he is defending Mr. Stephens that it is in fact a self-serving article to present his point of view. It is damaging to Mr. Stephens. * * * I think you would have to decide on the basis of the article that Mr. Stephens is a very unstable person and that he is arrogant, persistent, a heckler and completely looses control of himself under stress."

She then described in technical detail the basis for her conclusion.

At the time this case was tried below and at the time it was argued before this Court, the bench and bar did not have the benefit of the views expressed by Judge Irving A. Levine for the Court of Appeals in *Jacron Sales Co., Inc. v. Sindorf,* 276 Md. 580, a case which substantially changes the complexion of the Maryland law of defamation as we have known it. In announcing the issue posed in *Jacron Sales Co., Inc. v. Sindorf, supra,* it was stated:

"We are asked here to determine the extent to which the First and Fourteenth Amendments to the Federal Constitution are applicable to actions for defamation by private individuals against defendants who are not publishers or broadcasters; alternatively, we shall decide as a matter of state law whether the law of defamation should be

changed in view of recent decisions of the Supreme Court. *See Gertz v. Robert Welch, Inc.*, 418 U. S. 323, 94 S. Ct. 2997, 41 L.Ed.2d 789 (1974)."

There followed the Court of Appeals' construction of the Supreme Court's holdings in *New York Times Co. v. Sullivan*, 376 U. S. 254 (1964); *Curtis Publishing Co. v. Butts*, 388 U. S. 130 (1967); and *Rosenbloom v. Metromedia*, 403 U. S. 29 (1971). On the basis of an appraisal of *Gertz*, in light of these three prior Supreme Court decisions, the Court of Appeals announced: " * * * we conclude as a matter of state law that the *Gertz* holding should apply to media and non-media defendants alike, and to both libel and slander." Asserting that "We must here decide, however, the standard of liability which should govern this case," the Court then stated the hard core of its conclusion:

"We hold, therefore, that a standard of negligence, as set forth in Restatement (Second) of Torts § 580B (Tent. Draft No. 21, 1975), which we here adopt, must be applied in cases of purely private defamation. Section 580B states:

'§ 580B. *DEFAMATION OF PRIVATE PERSON.*

ONE WHO PUBLISHES A FALSE AND DEFAMATORY COMMUNICATION CONCERNING A PRIVATE PERSON, OR CONCERNING A PUBLIC OFFICIAL OR PUBLIC FIGURE IN RELATION TO A PURELY PRIVATE MATTER NOT AFFECTING HIS CONDUCT, FITNESS OR ROLE IN HIS PUBLIC CAPACITY, IS SUBJECT TO LIABILITY, IF, BUT ONLY IF, HE

(a) KNOWS THAT THE STATEMENT IS FALSE AND THAT IT DEFAMES THE OTHER,
(b) ACTS IN RECKLESS DISREGARD OF THESE MATTERS, OR

(c) ACTS NEGLIGENTLY IN FAILING TO
ASCERTAIN THEM.'

It is to be noted that under the negligence standard
which we adopt here, truth is no longer an
affirmative defense to be established by the de-
fendant, but instead the burden of proving falsity
rests upon the plaintiff, since, under this standard,
he is already required to establish negligence with
respect to such falsity."

With respect to the quantum of proof required of a private
plaintiff, the Court stated:

"We hold that proof of fault in cases of purely
private defamation must meet the standard of the
preponderance of the evidence. This is the quantum
of proof ordinarily required in other types of
actions for negligence, and is apt to be more readily
understood by juries."

From the foregoing excerpts from the Court's opinion in
*Jacron*, it is apparent that the parties, as well as the court in
the trial below, were trying the issues in accordance with a
slate of rules no longer valid and effective. In assessing the
defamation issues posed in this appeal, we are governed not
by the old rules but by the principles announced in *Jacron*
which became effective during the pendency of this appeal.
*Firstman v. Atlantic Constr. & Supply*, 28 Md. App. 285
(1975). Because both parties to the appeal are entitled to the
benefit of those principles, we shall reverse the judgment
entered on the directed verdict in favor of the appellee and
remand the case for a new trial.

In so doing, we observe that the trial judge was of the
opinion that the appellee's motion for a directed verdict
should be granted because the appellant had failed to prove
damages. Such a finding should be carefully reviewed in the
light of *Jacron* and *Gertz*. In the latter case, the Supreme
Court said, at 349-50:

"It is necessary to restrict defamation plaintiffs
who do not prove knowledge of falsity or reckless

disregard for the truth to compensation for actual injury. We need not define 'actual injury,' as trial courts have wide experience in framing appropriate jury instructions in tort actions. Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury."

> *Judgments reversed; case remanded for a new trial in accordance with this opinion; costs to be paid by appellee.*

### Appendix

### STATEMENTS BY MAYOR LEWIS C. DIXON
Relative to the Stephen's/Mt. Airy Conflict
MT. AIRY TOWN COUNCIL MEETING
OCTOBER 1, 1973

We have seen much in the news in the last few months about the disagreement between Frederick W. Stephens and the elected officials of Mount Airy and in particular the physical confrontation between myself and Mr. Stephens, following the Town Council meeting on June 18, 1973. We have reported all of these facts to the press from time-to-time but in recent weeks we have steadfastly refused to cooperate with those of the press who have sought to exploit these matters. There have been articles that have not been truthful or have been misleading. The public has been misinformed in substance and by the significance placed on these matters. The elected officials of Mt. Airy and

Mr. Stephens have been placed in an unfavorable light that neither party deserves. These comments that follow are intended to place these matters in a more precise perspective and to clear the air on several matters.

Let me assure all at this time that the elected officials of Mt. Airy and its citizens do not blame Mr. Stephens for his pursuit of all that he believes is right or to gain all that he believes is due him. Mr. Stephens is not always right. He should not expect others to always agree with him. It doesn't help his personal image to purposefully and unjustly attempt to degrade the character of others.

Mr. Stephens claims that the Town of Mount Airy has been arbitrary towards him; that the Town has not listened to him; and that the Town has failed to act on his just grievances. The town has acted as it deemed appropriate but Mr. Stephens does not recognize these decisions if he disagrees with the decisions. Let us look at the major ones.

The Town of Mt. Airy has been planning a public sewage system for nearly twenty years in my personal knowledge. The location of the treatment plant has been given extensive attention. One does not locate such important components by throwing darts at a map or by some other arbitrary approach. Locations in the Monocacy River watershed were ruled out for a number of factors including population distributions and centers of expected growth trends. Let me assure you that valid arguments could be generated but probably not sustained to have located the treatment plant in Frederick County. The location of our new treatment plant as we find it today was not a simple decision by the Town of Mount Airy and its Engineer, but rather a fully coordinated decision among several Government Agencies. It is the approved site of such agencies as the County and State Health officials, the Pure Water Administration, the Farmers Home Administration (FHA), certain offices in the "Health" side of the Health Education and Welfare Administration (HEW), elements of HEW that have been absorbed in the Environmental Protection Agency (EPA), and others, including the courts of this State. Many sites have been considered. When Mr. Stephens challenged the

fair and equitable acquisition of his property, he also challeged the site as well as a host of other items, but the courts did not find justifiable cause to challenge the site selection. The site selection was not arbitrary and Mr. Stephens knows this, yet he continues to pursue the matter.

Let me spend a few brief moments on the price the Town paid Mr. Stephens for his property. Our final offer to him for his 5-acre tract on April 20, 1970 was $10,284.00. This figure included allowances for value degradation and punitive damage to contiguous property of Mr. Stephens. Some Mount Airy Citizens believed this figure was too high. The land lies in a flood-plain area and is not acceptable for development purposes. This is true for any land subject to flooding. The land is swampy. In spots it is too swampy to make good pasture. These swampy areas represent a problem now for the Town to mow. Mr. Stephens felt that his land was worth more than the Town offered him. He quoted figures as high as $52,000, but the officials of this Town would not approve the expenditure of public funds for value they believe would not be received. In the final analysis the Town found it necessary to acquire the property through its power of condemnation, a procedure through which the Court establishes the conditions affecting the transfer of the property. To my knowledge, this is the only condemnation procedure ever completed by the Town though others have been started. Possibly you haven't looked at it this way but the Carroll County Jury disagreed with Mt. Airy in this Condemnation. In effect it determined, after hearing through its professional appraisers that $9,566.00 was a fair price, $718.00 less than the Town had offered. The courts made no other stipulations conditional to the transfer of this property. I believe that you must agree with me that for the town to do anything more than to follow the decision of the Court would be a violation of public interest; to do anything less, would be to treat Mr. Stephens unjustly. We have followed the Court decisions to the letter. Mr. Stephens knows this.

It is not fair in my opinion to Mr. Stephens, his family, or to the good people of Mt. Airy when he is encouraged by the

press to make claims that he has been treated unfair and unjustly in this matter. Let me speak in his defense. The public and its officials must have empathy for any citizen whose private domain has been violated to any degree by condemnation procedures. Those officials who find it necessary to violate a private sector in the public interest may never look upon such actions with pride.

There are an assortment of complaints by Mr. Stephens relative to the construction of the new Treatment Plant at Mt. Airy. Those involved in the administration of the contract do not agree with him. It's an honest disagreement. He has been told that these matters would be pertinent topics for consideration at the time FHA inspects the project. FHA will rule upon all such matters for each of the government agencies having an interest in the project. FHA will accept the project only when all obligations have been satisfactorily met. This Mr. Stephens knows, yet he persists in degrading this Town and its officials for not meeting his demands.

Mr. Stephens is the writer of lengthy letters to which he demands written answers. He has been given answers, most often verbally. On June 18, 1973 following a Town Council meeting, he asked me for written answers to letters that he had written. I told him that I would again give him verbal answers and do it then. He said he did not want verbal answers, but I gave him verbal answers on several of these matters — and he listened. He interrupted my conversation with persistance. Several of my responses to his provocations irritated him. He became increasingly abusive and violant. Mr. Stephens was the aggressor. He was hostile and arrogant. He was highly emotional and incoherent. He failed to respond to my request and direction to leave the Town Hall. At the beginning of the "fight" he was butting my forehead with his forehead and screaming.

I was in a defensive mood. I cannot tell you exactly what was happening in those next few moments. I am convinced that I did not loose my temper. I am almost certain that I did not throw any punches in spite of the fact that I had sore knuckles on my right hand the following morning. Actually I

am not sure that Fred ever threw a punch or hit me with his closed fist. His arms were thrashing about. He clamped a violent headlock on me, bruised the cheek of my face and cut one side of my nose and it bled. This was not a typical nose bleed. It was a small cut as if by a fingernail. Most fingernails are covered in a closed fist. I do not believe the bruises on my face were the result of a blow by a closed fist. I patiently tolerated Mr. Stephens headlock waiting for other citizens to enter the office. I did not try to break his headlock as we spun around in the office. We hit the closet doors in the outer office violently and I made some attempt to hold him against these doors. I am more positive that we were never rolling on the floor as has been reported.

The morning after the incident I discussed the matter with the Chairman of the Council and later with legal counsel. My personal position was not to prosecute Mr. Stephens for his provocations unless legal counsel and the Town Council felt this was necessary to insure civil order. To this the Chairman of the Council and our attorney agreed. An air of empathy existed for Mr. Stephens. It was felt that he has been frustrated and harrassed, for the most part, as a result of his own decision not to seek legal counsel in his defense against our Condemnation Actions. It was also felt that as Town Officials we were obligated to record the fight incident in the Town Records as a very minimum action and that this would be very important in the future if court actions to insure order would become necessary. The "don't come back until you apologize" philosophy evolved. There has been no attempt to deprive anyone of their constitutional rights, however the Town Council and this Mayor will do all in its power to insure order. The wording of the minutes of the Town Council of July 2, 1973 may not be the best and could be interpreted ambiguously, however, its purpose is to insure order in these public offices.

In October 1973, over three months after the fight incident, the derogatory dialogue in the press continues. We believe this is most unfortunate. In both the public and private interest it is desirable to close the incident.