## STUART F. KELLY *v.* EXXON CORPORATION

[No. 586, September Term, 1976.]

*Decided March 14, 1977.*

The cause was argued before MORTON, MELVIN and LISS, JJ.

*W. Lee Harrison,* with whom were *William E. Seekford* and *Daniel T. Doherty, Jr.,* on the brief, for appellant, cross-appellee.

*Donald E. Sharpe* and *Jeffrey D. Herschman,* with whom were *Piper & Marbury* on the brief, for appellee, cross-appellant.

LISS, J., delivered the opinion of the Court.

This complex and convoluted case reaches us on appeal and cross-appeal from judgments on verdicts returned by a jury in the Circuit Court for Baltimore County (MacDaniel, J., presiding) in favor of Stuart F. Kelly ("Kelly"), appellant/cross-appellee, against Exxon Corporation ("Exxon"), appellee/cross-appellant. The jury found that Kelly was entitled to the sum of one thousand dollars ($1,000) as compensatory damages and forty thousand dollars ($40,000) as punitive damages for the alleged malicious prosecution of Kelly by Exxon.

The controversy had its genesis in August, 1973, when William J. Clinton, security agent for Exxon, communicated with a Corporal Claude O. Keen of the Maryland State Police

and requested his cooperation in an investigation of the disappearance of company products from Exxon's Dundalk terminal. The plan agreed upon and carried out on September 26, 1973, was that the assistant terminal superintendent, Brady Moore, and the garage superintendent, Edward Anderson, equipped with binoculars, would position themselves on two partially constructed parallel bridges (about 250 feet from the garage) from which they would conduct a surveillance of the night shift garage mechanics.

Kelly, one of the two mechanics working, spent several hours repairing a tank truck radiator, and at some point during the evening, he removed several five gallon oil cans from the trunk of his car and was seen carrying them through the garage. The testimony is conflicting as to what occurred from that point on. Kelly said that the cans contained "junk" material which he dumped into the garage trash dumpster; the private use of the dumpster by the mechanics was permitted by the company. Moore testified that Kelly took the five gallon cans from the trunk of his automobile and proceeded to the manifold lines of a tank truck from which he filled the cans;[1] that he saw Kelly place the cans on the ground near the garage and back his personal car up to the garage; that he further saw Kelly make motions "that any reasonable person would take to be lifting motions; however [Kelly's] body was between me and the car and I could not physically see those cans go into his car"; and that so far as Moore knew, neither he nor any other Exxon employee had actually seen Kelly carry any gasoline from the Dundalk facility on that night or on any other night. Anderson testified that he saw Kelly back his car up to the garage and heard the manifold valve slam off, but because of obstructions to his view, he did not see Kelly drain any gasoline out of the manifold line of any of the tank trucks or put anything into the trunk of his car.

---

1. The manifold lines of a tank truck serve the purpose of transferring product from a particular compartment of the truck to an external storage truck. The manifold lines are equipped with a series of valves which permit the operator to direct the flow of product.

Kelly stated that he may have drained the manifold line of one of the trucks that evening but that this was not unusual because as a safety measure, it was often considered necessary to drain gasoline from the manifolds. This "slop gas" (contaminated gasoline), he said, was either thrown away or with the company's knowledge used by employees to wash their jackets, gloves or other clothing. He denied placing the cans in the trunk of his car and denied removing any gasoline from the Exxon terminal.

On October 8, 1973, Kelly was called into Anderson's office where a number of Exxon's management personnel were present; they advised him of the surveillance of his activities on the night of September 26th and that he was suspected of stealing company gasoline. Kelly denied the charge and returned to his work; he was advised later that afternoon that the company had decided to suspend him pending further investigation.

A week later, Kelly was informed that he was being terminated for "violation of a posted offense or offenses" relating to the commission of a crime on company time or property and stealing from the company (or from others) on company time or property. On October 24th, Corporal Keen called Kelly and advised him that he was going to have to arrest him; they arranged to meet the following afternoon at police headquarters; and Moore in the interim had that morning executed an affidavit for a summons/arrest warrant alleging that Kelly had taken 15 gallons of gasoline from Exxon's Dundalk garage terminal. Kelly was arrested, processed, placed in the lock-up, and later released on his personal recognizance. The case was called for trial before a jury on December 18, 1973, in the Criminal Court of Baltimore, but after the selection of the first four prospective jurors, the State advised the court that it would enter a nolle prosequi in the case.

On September 27, 1974, Kelly filed a Declaration in the Circuit Court for Baltimore County against Exxon, Clinton and Moore, individually and as servants and employees of Exxon. The Declaration in a number of counts charged the defendants with malicious prosecution, slander, and false

imprisonment arising out of the alleged theft of Exxon's gasoline. Subsequently, an Amended Declaration was filed against the same defendants alleging malicious prosecution and slander.

On April 26, 1976, a jury was impaneled and the case proceeded to trial. At the close of Kelly's case-in-chief, the court granted a motion for a directed verdict as to the slander count, removing Clinton as a defendant; Kelly was granted a motion to dismiss his claim as to Moore; and the case proceeded against Exxon only as to the issue of malicious prosecution. We have heretofore specified the verdicts returned against Exxon, which subsequently filed and was denied a motion for judgment notwithstanding the verdict or in the alternative a new trial. This, then, was the posture of the case antecedent to the appeals and cross-appeals now before us.

There are a number of interesting and involved questions raised by the parties, and we shall consider them in the order which we believe will provide the most comprehensive disposition of them.

## I

Cross-appellant, Exxon, raises three issues basic to the determination of the case, and we shall consider these issues first.

1) *Was there legally sufficient evidence from which the jury could conclude that there was an absence of probable cause for the institution of the criminal proceeding?*

Traditionally, malicious prosecution suits are disfavored by the law. *Siegman v. Equitable Trust Co.*, 267 Md. 309, 297 A. 2d 758 (1972); *North Point Construction Co. v. Sagner*, 185 Md. 200, 44 A. 2d 441 (1945). The reason given by the courts for this disfavor is that criminal prosecutions are essential for the maintenance of social peace and should not be discouraged by the threat of subsequent civil proceedings. *Stansbury v. Luttrell*, 152 Md. 553, 137 A. 339 (1927).

Maryland, however, does recognize actions for malicious prosecution, and in *Gladding Chevrolet, Inc. v. Fowler*, 264

Md. 499, 505, 287 A. 2d 280 (1972), the Court stated the elements of such an action:

"To prevail in a suit for malicious prosecution the plaintiff must show: (1) that the criminal proceeding instituted or abetted by the defendant has terminated in his favor, apart from whether any inference as to probable cause for the proceeding arises from the termination; (2) a want of probable cause for the proceeding which may, or may not, be inferred from the termination of the proceeding, depending upon the manner of the termination; (3) malice, which is a primary purpose for the institution of the proceeding, other than that of bringing an offender to justice."

*Brewer v. Mele,* 267 Md. 437, 298 A. 2d 156 (1972); *Banks v. Montgomery Ward & Co, Inc.,* 212 Md. 31, 128 A. 2d 600 (1957); and *Shipp v. Autoville Ltd.,* 23 Md. App. 555, 328 A. 2d 349 (1974).

The initial question to be determined here is whether Kelly produced sufficient evidence of lack of probable cause to entitle him to have the issue put before the jury? Exxon answers in the negative and urges, therefore, that the trial court erred in denying its motion for a directed verdict. Our appellate courts have consistently held that where the facts and inferences reasonably deducible therefrom are clear and undisputed, then the question of probable cause is one of law. *Durante v. Braun,* 263 Md. 685, 284 A. 2d 241 (1971); *Kennedy v. Crouch,* 191 Md. 580, 62 A. 2d 582 (1948); *Kimbrough v. Giant Food, Inc.,* 26 Md. App. 640, 339 A. 2d 688 (1975).

When considering a motion for a directed verdict submitted on the ground that there is no evidence legally sufficient to show lack of probable cause, we must apply the fundamental rule that the evidence and inferences fairly deducible therefrom must be viewed in a light most favorable to the party against whom the motion is directed. *Levine v. Rendler,* 272 Md. 1, 320 A. 2d 258 (1974); *Derby v.*

*Jenkins,* 32 Md. App. 386, 363 A. 2d 967 (1975); *Picone v. Talbott,* 29 Md. App. 536, 349 A. 2d 615 (1975).

In *Tully v. Dasher,* 250 Md. 424, 440, 244 A. 2d 207, 217 (1968), the Court of Appeals explicated the test to be applied under these circumstances:

> "It is well established that when a defendant moves for a directed verdict in his favor he must, for the consideration of the motion, concede the truth of all facts that tend to support the right of the plaintiff to recover as well as all inferences which might naturally and reasonably be deduced from those facts, even though these facts may be contradicted. If there is any legally relevant and competent evidence from which a rational mind could infer a fact in issue, the trial court should not invade the province of the jury by directing a verdict for the defendant." (Citations omitted).

We have carefully reviewed the record and find substantial disagreement between the appellant and appellee as to what occurred on the night of September 26, 1973. There are discrepancies even in the testimony of Exxon's witnesses as to what they observed that night. Kelly's version of the events of that evening are consistent with his complete innocence of the charge made against him; the versions of Moore and Anderson may at best be characterized as giving rise to a suspicion that Kelly was stealing gasoline but are not enough to amount to probable cause as a matter of law. The witnesses disagree as to what occurred in the office conference on October 8 — Kelly places a different interpretation on his alleged admissions than does Exxon. In his testimony, Kelly categorically denied ever stealing any gasoline during his 17 years as an employee of Exxon, flatly denied stealing any gasoline on September 26, and positively denied ever admitting to anyone that he stole gasoline. It would serve no useful purpose to detail the innumerable contradictions in the testimony of Kelly, Moore, Clinton, and Anderson, but these contradictions, we believe, are sufficient to have raised a substan-

tial issue of material fact justifying the submission of the issue of probable cause to the jury.

2) *Did the plaintiff produce sufficient evidence to justify the submission of the issue of malice to the jury?*

It is axiomatic that malice is an essential element of a malicious prosecution action. The issue of malice in such an action is not, however, confined to a mere determination of whether one party acted out of ill-will, spite, hatred, or reckless conduct but rests upon a determination as to whether a party acted "with any motive other than that of bringing an offender to justice." *Gladding Chevrolet, Inc. v. Fowler, supra; Durante v. Braun, supra; Safeway Stores, Inc. v. Barrack,* 210 Md. 168, 122 A. 2d 457 (1956); *Johns v. Marsh,* 52 Md. 323 (1879).

Exxon argues that Kelly presented evidence which negated any showing of malice either by proof of actual malice or by inference which might be drawn from an alleged lack of probable cause. It contends that where the plaintiff-appellant negates such an inference in his own case, the trial court must direct a verdict for the defendant-appellee. *Wesko v. G.E.M., Inc.,* 272 Md. 192, 321 A. 2d 529 (1973); *Siegman v. Equitable Trust Co., supra.* It urges that there is no evidence in the record that either Exxon or Moore, its employee upon whose affidavit the warrant was issued, harbored any malice or ill-will towards Kelly.

Our review of the facts, however, convinces us that there was evidence produced by appellant which justified submitting the issue of malice to the jury: The testimony of Moore, Kelly's principal accuser, vacillated from his earlier position of having seen Kelly steal the 15 gallons of gasoline to his later statements (to the assistant state's attorney) that "I could not physically see the cans lifted into the car, and could not say that I could see something I didn't." Kelly was suspended from employment and a week later fired from a job which he had performed satisfactorily for 17 years. The State policeman, Keen, and a representative of Exxon were permitted to search Kelly's garage, but no

Exxon property was found there. The value of the gasoline allegedly taken by Kelly amounted to approximately three dollars. It is not surprising then that having already imposed the sanctions of loss of employment and fringe benefits, Exxon — as evidenced by the following colloquy between counsel for Kelly and Moore — declined to bring any criminal charges:

"Q. Who are you sure of was there at that meeting, who are you sure, positive was at that meeting? A. Ashby Keen, Bud Ulle and Al Roberts and myself.[2]

Q. Okay. And at that time you said you didn't want to bring any criminal charges? A. That's correct.

Q. Who said that, did Mr. Ulle say that or Mr. Roberts? A. Al Roberts.

Q. Did he say why? A. It has not been our practice as a company to bring criminal actions in this area, we have done it, but it is not a normal practice."

It was Keen, as evidenced by his testimony which follows, who insisted that charges be brought against Kelly:

"Q. Isn't it true that you, during this period between September 28 and October 6, informed Mr. Clinton that should Exxon decide not to allow Mr. Moore to execute an affidavit you would have to consider the possibilities of subpoening him to give testimony? A. Yes, sir.

Q. Why did you do that? A. Well, I felt Mr. Kelly should be charged just as the others were, and I wanted to see him charged."

Moore in his testimony further illuminated the reason why criminal charges were placed against Kelly:

"Q. What did the State Police have to do with Mr. Kelly being charged? A. At the time we

---

2. Ulle and Roberts were management personnel of Exxon.

discussed in Mr. Bud Ulle's office several other cases, *I told them of the information that I had seen, that I had seen Kelly take fifteen gallons of gasoline, and we were told that we should press charges. We declined to do so. And [Keen] said, if we refuse to come down and make the charge I would be subpoenaed to come down and do so.*

Q. How could you be subpoenaed to come down and do so? A. I was told by the State Police that I would be *because I had seen a crime committed."* (Emphasis supplied).

It is obvious that Exxon's decision to place the charge against Kelly was occasioned not by its desire to bring a miscreant to justice but to satisfy the demand of Corporal Keen. To describe the latter's conduct as officious seems to us to be rather charitable. Exxon contends that it is not malicious *as a matter of law* for a private person to initiate a prosecution on the advice of a disinterested law enforcement officer to whom that person has disclosed all material facts. But these are not the facts in this case: It was the far from disinterested law enforcement official who *insisted* that the employee be charged and who threatened to subpoena the private individual if he did not cooperate in securing the warrant. It was to appease the police officer as well as to avoid the inconvenience and embarrassment of being subpoenaed to testify that Exxon authorized Moore to swear out the warrant. Whether Exxon's submission to the police officer's pressure amounted to a malicious act was, we believe, a jury question. It was for the jury to determine from the facts and the law whether the prosecution instituted by Exxon was justified or malicious. The maxim *maleficia propositis distinguintur* — evil deeds are distinguished from evil purposes — is here illustrated, where the swearing out of a warrant is not per se an evil deed but may be made one by the unacceptable purpose for which the act was done.

3) *Did the trial court err in instructing the jury that the nolle prosequi could be considered by the jury as evidence of lack of probable cause?*

Exxon concedes that the termination of the criminal proceeding against Kelly by way of nolle prosequi was sufficient to permit Kelly to file an action for malicious prosecution. *Norvell v. Safeway Stores, Inc.*, 212 Md. 14, 128 A. 2d 591 (1957). It is undisputed that dismissal by a magistrate at a preliminary hearing is prima facie evidence of a want of probable cause while acquittal after a trial is not. *Banks v. Montgomery Ward & Company, Inc., supra.* More difficult to ascertain is what the effect is, if any, of a nolle prosequi in the determination of the issue of probable cause. Exxon argues that the trial court erred when it instructed the jury as follows:

> "In considering whether or not there was a lack of probable cause in this case for the bringing of a larceny charge against the plaintiff by the defendants, the fact that the charges against the defendants were nol prossed by the prosecution may be considered as evidence of want of probable cause. It does not mean it is; it just may be considered as evidence of probable cause along with other elements in the case."

Kelly, as cross-appellee, contends that this issue is not properly before this Court because in not stating the reason for its exception to the trial court's charge to the jury, Exxon failed to comply with the requirements of Maryland Rule 554 d.[3] The purpose of Rule 554 d is to insure that both the trial judge and opposing counsel understand the nature and the grounds of the exception. It provides an opportunity for the trial judge to correct, amend, or clarify an instruction before the jury retires to consider its verdict. No special form is required for the objection and no ground even need be stated provided all parties understand the reason for the

---

**3.** Rule 554 d of the Maryland Rules of Procedure provides: "If a party has an objection to any portion of any instruction given, or to any omission therefrom, or to the failure to give any instruction, he shall before the jury retires to consider its verdict make such objection stating distinctly the portion, or omission, or failure to instruct to which he objects and the ground of his objection. Opportunity shall be given to make the objection in open court out of the hearing of the jury upon application either orally or in writing, made before or after the conclusion of the charge."

objection. *Stephens v. Dixon,* 30 Md. App. 56, 351 A. 2d 187 (1976); *Kraft v. Freedman,* 15 Md. App. 187, 289 A. 2d 614, *cert. denied,* 266 Md. 736 (1972); *Kowalewski v. Carter,* 11 Md. App. 182, 273 A. 2d 212 (1971).

Our reading of the record convinces us that the trial court properly had before it the objection by Exxon to its instruction regarding the consideration to be given, if any, to the nolle prosequi. All parties understood the basis for the objection. The trial court elected to give an additional instruction to correct a deficiency in its original one — pointed out by Exxon by a second exception — but refused to change its original instruction that the jury could consider the entry of the nolle prosequi as evidence of a lack of probable cause. Under these circumstances, we do not believe the exception to the charge was waived, and the matter is properly before this Court. Maryland Rule 554 d; *Stephens v. Dixon, supra; Kraft v. Freedman, supra.*

The question of whether the jury may consider the abandonment of pending criminal charges by nolle prosequi as evidence of a lack of probable cause has not been resolved in Maryland. In *Norvell v. Safeway Stores, Inc., supra,* the Court stated:

"Whether such a termination [*nolle prosequi*] is evidence of a want of probable cause is a question on which the authorities are divided. *Prosser* inclines to the view that it is not. See also *Western Union Telegraph Co. v. Thomasson, supra,* page 838, and *Shoemaker v. Shoemaker,* 78 A. 2d, 605, 608 (N.J. App. Div.). The *Restatement, Torts,* § 665, takes the position that dismissal by a public prosecutor is not evidence of a want of probable cause, but *contra,* as to dismissal by a private prosecutor." 212 Md. at 22-23.

In *Norvell,* two charges had been brought against the accused, the first by Safeway and the second by one of its employees. The accused was acquitted — after a trial — on the charges brought by Safeway, and the second charge was nol prossed by the state's attorney. The Court concluded that

it could not attribute the nolle prosequi of the second charge to a determination by the state's attorney that there had been a lack of probable cause at the time the warrant was sworn out.

Prosser, *Law of Torts,* § 119 (4th ed. 1971) states the applicable general rule as follows:

"A discharge brought about by the abandonment of the proceedings by the prosecuting witness or the prosecuting attorney usually is held to afford no evidence of lack of probable cause; but here again there are decisions to the contrary."

The rule as announced in the *Restatement of Torts,* § 665 (1938) is equally ambiguous as to the effect of a nolle prosequi. We quote here the precise text of the section:

"§ 665 EFFECT OF ABANDONMENT OF PROCEEDINGS.

(1) Unless explained, the termination of the proceedings in favor of the accused at the instance of the private prosecutor who initiated them, or because of his failure to press the prosecution, is evidence of a lack of probable cause.

(2) The abandonment of proceedings by a public prosecutor *acting on his own initiative* after the prosecution has passed into his control, is not evidence that the private prosecutor acted without probable cause." (emphasis supplied).

The Restatement's Comment on Subsection (2) states the rationale of the subsection's rule to be that the accuser should not be prejudiced by the action of the public prosecutor over whom he has no control. The Comment continues at 415-416:

"If, however, the action of the public prosecutor was at the instance of the private prosecutor or conditioned upon his consent, the inference that the latter had no probable cause for his action in initiating the proceedings would be permissible."

We believe the rule of law stated in the Restatement to be the more equitable one. It permits the jury to consider the facts and circumstances surrounding the *particular* entry of the nolle prosequi as one of the elements to be considered in determining whether or not the private prosecutor had probable cause for the swearing out of a warrant. In this case, there was evidence from which it could be argued that the nolle prosequi was entered if not at the instance of Exxon at least with its knowledge and consent. While it is true that the transcript of the criminal proceedings contains an explicit statement by the assistant state's attorney that "the State has taken upon itself to nolle prosequi the charge and not the complaining witness," the testimony of Moore and Roberts (Exxon's management personnel) belie that statement. We quote first a portion of the testimony of Moore:

"Q. Now, You were present at the trial in the Criminal Court of Baltimore City on December 18, 1973, were you not? A. Was that Mr. Kelly's trial?

Q. Yes, sir. A. Yes, I was.

\* \* \*

(Mr. Sharpe) The question was, who asked for the recess.

(The Court) Overruled.

(The Witness) I believe it was asked for by the State's Attorney, but I am not sure.

By Mr. Harrison:

Q. Do you know who requested him to ask for a recess? A. No, I do not.

Q. Did the State's Attorney hold a conversation with Exxon firm's members of management? A. Yes.

Q. And who were those members of management? A. Al Roberts, probably Bill Clinton and myself, and maybe some others, but I do not know.

Q. And what was discussed at those conferences with the State's Attorney? A. Whether we, whether he would proceed with the case.

Q. Why? A. Because I could not physically see the cans lifted into the car, and could not say that I could see something I didn't. He felt that, I assume he felt there was insufficient evidence to do it; I don't know what his reason was.

Q. Insufficient evidence to convict the man? A. I assume that was his reason.

Q. So was a decision made to come back and nol pros the case? A. Yes; the State's Attorney made that decision."

We now quote from the testimony of Roberts:

"Q. Did you participate in any conference with the State's Attorney for Baltimore City? A. Yes, I did.

Q. Who else from Humble participated in those conferences? A. As I recall, it was Bill Clinton, myself — I am not sure whether Brady Moore was in the office at the time. I know it was Bill and myself and I think the gentleman's name was Cymek, the assistant.

Q. Wasn't it decided to nol pros that case?

\* \* \*

A. Maybe. Can I walk you through this?

Q. Sure, go ahead. A. When I saw the Humble Oil and Refining v. Stuart Kelly [sic], this is when I began to be more familiar with the investigating activity and Corporal Keen and this type of thing. I said, *I am not really clear as to whether or not this is the way the company's understanding of the case is supposed to be.* I wanted to call our attorneys at Hunt Valley. After having gotten in touch with Mr. Dulany, who is our house counsel, I suggested he talk directly to the other lawyers since I didn't want to try to broker legal jargon.

Q. Mr. Cymek? A. Yes.

Q. Did you hear anything Mr. Cymek said to Mr. Dulany? A. I could hear him talking but I didn't pay attention.

Q. You don't know what was said? A. No, I do not.

Q. What was the result of that conversation? A. You have to understand, the Judge was telling us to get out and Mr. Cymek was running back and forth, and on one of his return trips he said the case had been nol prossed, which I understood like I do other legal jargon. I assumed it was over.

Q. You understood nol pros? A. He told me and then he explained it to me." (emphasis supplied).

We believe the trial court was correct in instructing the jury that it might consider the facts and circumstances surrounding the entry of the nolle prosequi together with all the other evidence in the case in determining whether Exxon had probable cause to instruct its employee to swear out the warrant against Kelly.

We have carefully considered the extensive record and the excellent briefs filed by the parties to this suit and find that the trial court committed no reversible error in this portion of the proceedings.

## II

We must now consider the issues raised by Kelly, the original appellant in this case, and Exxon, the original appellee. The basic issue raised by Kelly is:

1) *Did the trial court err in granting appellee's motion in limine, thus precluding the appellant from introducing evidence and arguing to the jury those facts concerning his loss of fringe benefits and wages allegedly incurred by reason of Exxon's wrongful firing of him and the malicious prosecution of the appellant by his employer?*

Before the trial of the case was begun on its merits, Exxon filed a motion in limine requesting the trial court to preclude

the appellant from introducing any evidence concerning his lost wages and loss of fringe benefits arising out of the alleged improper termination of his employment by Exxon. Exxon advanced two grounds for its motion: 1) That the alleged damages were not proximately caused by the malicious prosecution suit; and 2) That any damages recoverable for these losses could only be recovered under the grievance arbitration provisions of the collective bargaining agreement between Exxon and its employees and were not properly recoverable in the malicious prosecution suit. The trial court granted the motion in limine on the first ground, and the trial proceeded with these items of damage excluded from the evidence.

The trial court held that the loss of benefits and wages was not proximately caused by the malicious prosecution of Kelly. The court ruled that Kelly was terminated as a result of the company's contention that he had committed a violation of a "posted offense," i.e., stealing company property. Kelly was originally suspended on October 8, 1973, and terminated on October 15. The affidavit for the issuance of the warrant was not executed by Moore until 10 days after Kelly's termination. Whatever damages occurred by reason of his alleged improper termination occurred prior to the prosecution and would have occurred even in the absence of the criminal prosecution.

As authority for his position that the trial court should not have granted the motion in limine, appellant refers to the language found in *Fields v. Victory Chain Store, Inc.*, 300 N.Y.S.2d 688, 691-92 (S. Ct. Oneida Co., 1969):

> "The measure of damages in an action for malicious prosecution include injuries to the plaintiff's reputation and character resulting from the false accusation and also recovery may be had on account of mental suffering and humiliation due to the wrongful charge. Also included are the reasonable legal expenses including counsel fees. The damages recoverable in a malicious prosecution action since it is an action based upon a willful or

intentional act are those directly and proximately resulting from the original wrong, even though the damages are beyond the limits of those naturally and reasonably to be anticipated."

Appellant in his brief and argument before us contends that it was the "false accusation" which proximately caused the alleged loss of wages and fringe benefits. The only false accusation alleged, however, was that he had stolen property from Exxon, and it was as a result of that allegation that he was terminated 10 days before the beginning of prosecution. We agree with the trial court that even without the criminal prosecution, Kelly would have suffered all of the lost wages and fringe benefits which he seeks to recover as consequential damages in the malicious prosecution suit. We believe the able trial judge was correct in holding that the damages flowing from the allegedly improper termination were recoverable, if at all, in the arbitration proceedings or in a breach of contract action but not in this malicious prosecution action.

Appellant raises as a corollary to its objection to the granting of the motion in limine another issue:

2) *Did the existence of arbitration procedure required in Exxon's collective bargaining agreement with its employees preclude Kelly from claiming as damages lost wages and fringe benefits in the malicious prosecution suit?*

At the time of the occurrence of these events, there was in existence a collective bargaining agreement between Exxon and its employees with provisions governing the handling of grievances and arbitration in disputes between the employer and employee.

Kelly was discharged by Exxon on October 15, 1973; grievance proceedings were instituted by the Union and Kelly in December of 1973. The parties were unable to reach a satisfactory resolution of the grievance at the preliminary stage, and the matter was referred to an impartial arbitrator for final and binding arbitration. The arbitrator concluded that the discharge could not be contested because the grievance was not filed within the time period required

by Article XVIII of the collective bargaining agreement. The Union and Kelly filed an action in the United States District Court of Maryland seeking to overturn the arbitrator's decision. The Honorable Joseph H. Young of that Court granted Exxon's motion for summary judgment, affirming the arbitrator's conclusions. On appeal, the District Court's action was affirmed by the United States Court of Appeals for the Fourth Circuit.

Under the usual grievance procedure of a collective bargaining agreement, an employer is entitled to immunity from civil suit by individual employees who have or could have availed themselves of the grievance procedures. *Meola v. Bethlehem Steel Co.*, 246 Md. 226, 228 A. 2d 254 (1966); *Henthorn v. Western Md. Ry. Co.*, 226 Md. 499, 174 A. 2d 175 (1961).

*Henthorn* is apposite both as to facts and law. In that case, an employee was discharged for removing wire from his employer's premises. The discharge was made pursuant to provisions contained in the company's collective bargaining agreement. The union and the employee availed themselves of the review procedures provided by the terms of the agreement, and the determination of the propriety of the discharge was upheld. In the interim, the employee brought a civil suit for damages alleging wrongful discharge and defamation of character. On appeal, the Court of Appeals stated the narrow issue before it to be as follows:

> "[W]hether the plaintiff-appellant, having processed his claim for reinstatement and back pay through the internal appellate procedures available to him (through the aegis of the Brotherhood) under the employment agreement, as he was required to do, and elected to further litigate the propriety of his discharge before the Special Board of Adjustment created for that purpose . . . could thereafter maintain his suit for damages for wrongful discharge."

The Court's answer to this question was short, if not sweet. It said, "We think he could not."

It seems clear that the rationale of the decisions is that to permit interference by the courts with the binding grievance procedures negotiated in a collective bargaining agreement would destroy the purpose and effectiveness of the agreement. *See Union P.R. Co. v. Price,* 360 U. S. 601, 79 S. Ct. 1351, 3 L.Ed.2d 1460 (1959), (quoted in *Henthorn*); *Dewey v. Reynolds Metal Company,* 429 F. 2d 324 (6th Cir. 1970).

Appellant suggests that in this case arbitration is not the sole and exclusive remedy for a wrongful discharge because the collective bargaining agreement contains no explicit provision stating that arbitration is the sole remedy. That argument, however, has already been considered by the Court of Appeals in *Jenkins v. Wm. Schluderberg-T.J. Kurdle Co.,* 217 Md. 556, 144 A. 2d 88 (1958). The collective bargaining agreement in that case did not contain any express, affirmative statement that the only remedies which employees covered by it may have against their employer for alleged breaches of the agreement shall be through the grievance procedures provided for by the agreement. The Court held that the individual's remedy for a wrongful discharge as a general rule rested exclusively in the grievance procedure. Absent an allegation that the Union had unfairly and capriciously refused to process a properly presented grievance, an employee by failing to abide by the grievance procedure loses both his right to arbitrate and to litigate the discharge.

Kelly asserts that Article XXXII of Exxon's collective bargaining agreement explicitly states that nothing in the agreement shall affect certain benefit plans, that at the least he should have been permitted to introduce evidence as to those lost fringe benefits.

Appellee suggests that in considering these benefits, it is necessary to draw a distinction between those benefits which are contingent upon employment and those which are not. We agree in the first instance — that Kelly's discharge is dispositive of his non-entitlement to these benefits. As to those which are not contingent on continued employment, Exxon might be liable to Kelly for a breach of contract. Kelly may not, however, recover these damages for breach

of contract in a malicious prosecution suit. If he has improperly been denied benefits under Article XXXII of the agreement, his remedy would be to seek redress for the breach of contract.

For the reasons we have recited in this opinion, we find no error in the rulings of the trial court below and shall affirm the judgments for compensatory and punitive damages entered against Exxon.

*Judgments affirmed.*
*Costs to be divided between*
*appellant and appellee.*